# CHARLESTON.

K. S. LEITCH v. CHESAPEAKE & OHIO RAILWAY COMPANY

(No. 5513.)

Submitted February 16, 1926.   Decided March 23, 1926.

APPEAL AND ERROR—*Determination of Issues on Former Hearing Will be Regarded As the Law Upon Second Writ of Error Unless Case Has Been Materially Changed by New Evidence Based Upon Proper Pleadings.*

The determination of issues by this Court on a former hearing will be regarded as the law of the case upon a second writ of error, unless the case has been materially changed by new evidence, adduced at the subsequent trial, based upon proper pleadings.

HATCHER, JUDGE, absent.

(Appeal and Error, 4 C. J. § 3075.)

(NOTE: Parenthetical references by Editors, C. J.—Cyc. Not part of syllabi.)

Error to Circuit Court, Cabell County.

Action by K. S. Leitch against Chesapeake & Ohio Railway Company.   Judgment for plaintiff, and defendant brings error.

*Affirmed.*

*Fitzpatrick, Brown & Davis,* for plaintiff in error.

*Geo. B. Martin, Rufus Dinkle* and *Holt, Duncan & Holt,* for defendant in error.

LITZ, PRESIDENT:

Suing in trespass on the case, under the Federal Employers' Liability Act, the plaintiff, K. S. Leitch, recovered a verdict and judgment against the defendant, Chesapeake & Ohio Railway Company, in the sum of $18,000.00 for personal injuries sustained while engaged as locomotive engineer in the operation of one of its passenger trains between Hinton and Huntington, by coming in contact with the extended arm of a mail crane standing along the railroad track at Scary Station in Putnam County.

It is charged that the defendant erected and maintained the mail crane in such close proximity to engines and cars

passing over the track as to endanger the life, limbs and persons of the employees operating its trains. The plaintiff had been in the employ of the defendant as locomotive engineer eighteen years prior to his injury and, for the last two years, was engaged in passenger service between Hinton and Huntington. The train in his charge at the time of the accident, known as No. 1, did not carry mail, but was followed by mail train No. 3, running twenty or twenty-five minutes later. The plaintiff served as engineer of first one and the other of these two trains.

The crane stood on the outer side of a curve which the train was entering from another curve at a speed of from thirty to forty miles an hour when the accident occurred. The boiler prevented the plaintiff from seeing ahead through the small window in the front of the cab, while the engine was on the curve, and he was therefore compelled to look from the side window in order to observe a block signal 1157 feet beyond the crane. Under Rule 707 of the defendant all enginemen must "keep constant lookout ahead for signals and obstructions". While keeping a lookout for the signal, with his head projecting from the cab four to six inches, the plaintiff was struck in the face by the crane.

A short distance from the place of the accident a spring hanger on the right hand side of the engine broke, causing the engine to lean toward that side, on which the crane was located. Moreover, the high speed of the train and its progress from one curve into another naturally produced a swaying of the engine from side to side as it passed the crane. Without taking into consideration the leaning of the engine toward the crane, resulting from the breaking of the spring hanger, or the swaying of the engine due to the high rate of speed over a crooked track, according to the evidence for the plaintiff, the side of the engine cab came within nine inches of the extended arm of the crane while passing, if the width of the engine is 124 inches as stated by the defendant's master mechanic.

On a former writ of error judgment for the plaintiff in the sum of $20,000 was reversed because of admission of improper evidence. It was then contended this Court should hold as a

matter of law: (1) that the defendant was not negligent, and (2) that the plaintiff assumed the risk. These contentions were overruled. The defendant now asserts that the proof has been so changed upon the second trial as to warrant a different conclusion in respect to both issues. The new evidence, relied upon, is as follows:

(1)   The testimony of L. B. Allen, the defendant's Superintendent of Maintenance of Way, that the company was using at the time of the accident a standard, adopted by the Columbia Mail Crane Company, for the installation of mail cranes; and the evidence of T. H. Allen, its Superintendent of Bridges and Buildings on the Hinton division, that forty mail cranes were then in use along the east and west bound tracks of said division, which had been installed in accordance with the alleged standard. It does not appear, however, when these cranes were installed; nor is the distance from the track by actual measurement of any of them shown, except the one causing the injury which, according to the evidence for the defendant, stood a greater distance from the track than the standard prescribed.

T. W. King, Superintendent of Bridges and Buildings of the Huntington division, was also introduced as a witness on this subject. In the course of his examination the following questions and answers appear:

> Q.   Mr. King, I hand you a blueprint that was introduced in evidence on yesterday with the testimony of L. B. Allen, and I will ask you to state whether or not the mail cranes that were situated between Huntington and Hanley in July, 1921, were installed in accordance with that standard?
> A.   Yes, sir, so far as they were installed, they were installed in accordance with this.
> Q.   Mr. King, you did not personally superintend the installation of one of them, did you?
> A.   I gave instructions how to install them.
> Q.   You have no personal knowledge about that?
> A.   No, sir.

(2)   The testimony of W. A. Davies, defendant's Foreman of Passenger Car Department, that the cab of the type of engine in use by the company at the time of the accident

was 123 inches in width and the maximum width of the mail
cars operating over its lines 118 inches, some being as narrow
as 115 inches.  The hooks used by the mail clerks to take the
mail pouch from the crane were 29 inches in length and would
catch the pouch suspended on the crane at a distance of 24
inches from the side of the car; so that the mail pouch easily
could have been caught with the crane in question standing at
practically twice the distance it was from the engine cab.

(3)    The testimony of John F. Kirtley, agent at Scary
Station, who hung the mail pouch on the crane.  It is claimed
by the defendant that, according to the evidence of this wit-
ness, he had for about one year previous to the accident hung
the mail pouch on the crane ahead of Train No. 1.  He does
so state in his examination in chief, but on cross-examination
says he had been in the habit of hanging the pouch on the
crane only from five to fifteen minutes before the arrival of
Train No. 3:

> Q.    How long ahead of the coming of the train
> that is to take the mail sack did you hang the mail
> sack out?
> A.    Well, anywhere from five to fifteen minutes.
> Q.    Anywhere from five to fifteen minutes?
> A.    Yes, sir.
> Q.    Is that the postoffice regulations?
> A.    No, I don't know as it is.  I just tried to
> hang it out in time so the train would not miss it.
> Q.    Then your custom was to hang the mail sack
> out from five to fifteen minutes ahead——
> A.    Yes, sir.
> Q.    Of the train that was going to take it?
> A.    Yes, sir.

That the mail pouch was hung on the crane the day of the
accident in advance of the arrival of Train No. 1 may be ac-
counted for by reason of the fact that a local freight train,
which moved on about the time train No. 1 passed, had been
standing on the east bound track at Scary Station.  Kirtley
stated on the first trial that he had hung up the mail pouch
just before this local freight train pulled in.  Not knowing
how long it would, by standing at the station, cut off ready
access to the mail crane, and it being necessary for him to

remain at the station while the local freight was being handled, he no doubt decided to hang the pouch on the crane in advance of its arrival. His evidence on the former trial in this connection is as follows:

> Q. Where were you at the time the accident occurred, if you recall?
>
> A. Well, I had just hung the mail on the crane on this track, and the other track is next to the depot; the eastbound. And the local freight pulled in going east.
>
> Q. You say you had just hung the mail?
>
> A. Yes, sir, and come over. We unloaded some freight and the local freight was just pulling out leaving the station.

Train No. 3, as already stated, did not run until twenty or twenty-five minutes after No. 1 had passed. The jury was therefore justified in accepting the evidence of the witness on cross-examination from which the inference may be drawn that ordinarily the mail pouch was hung on the crane after No. 1 had passed. The arms of the mail crane, about three feet in length, arc extended only while the mail pouch is hanging, so there was no danger of employees of the railroad coming in contact with them at other times.

After analyzing and comparing the evidence on both trials, we cannot say that the case has been materially changed from that presented on the former writ. The decision of this Court on a former hearing will be regarded as the law of the case on a second writ of error, unless new pleadings and new evidence adduced on the subsequent trial call for a different judgment. *Keyser Canning Co.* v. *Klots Throwing Company,* (W. Va.) 128 S. E. 280.

The judgment of the circuit court is

*Affirmed.*